UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DONALD PIERCE                                              CIVIL ACTION

VERSUS                                                          NO. 15-6485

KELLOGG BROWN & ROOT, INC.                    SECTION "R" (3)

## ORDER AND REASONS

Before the Court is defendant's motion for summary judgment on plaintiff's claim that he was discharged because of his race.[1] The Court finds that plaintiff has failed to raise an issue of material fact that he was treated less favorably than similarly situated employees of a different race, and therefore grants the motion.

## I.    BACKGROUND

Plaintiff brings a claim of racial discrimination in violation of Title VII of the Civil Rights Act.[2] Plaintiff Donald Pierce is an African-American welder.[3] On April 29, 2015, Defendant Kellogg Brown & Root, Inc. hired plaintiff as a combination pipe welder on a construction project in

---

[1]    R. Doc. 70.
[2]    R. Doc. 1.
[3]    *Id.* at 1 ¶ 2.

Waggaman, Louisiana.[4]  Plaintiff was hired as an at-will employee.[5]  Plaintiff worked on the night shift, and he asserts that he was the only African-American on his five-person night shift crew.[6]  The night shift pipe foremen, welding foreman, and general foreman were white.[7]

At the time plaintiff was hired, defendant required new welders to pass three welding tests on carbon, chrome, and flux core.[8]  As a condition of continued employment, defendant also required that a new welder's first two welds on the project, known as production welds, pass x-ray examination.[9] Plaintiff passed his three welding tests and his two production welds satisfied x-ray examination.[10]  But plaintiff was discharged after problems with two subsequent welds, referred to in the pleadings as the Chrome Weld and the Underground Weld.[11]

### A. Chrome Weld

The Chrome Weld involved a heavy-walled chrome or stainless pipe intended to carry high pressure steam.[12]  A white welder, Wiley Hinton, Jr.,

---

[4]  R. Doc. 70-3 at 1-2 ¶¶ 2-5; R. Doc. 74-1 at 2 ¶¶ 2-5.
[5]  R. Doc. 70-3 at 2 ¶ 6; R. Doc. 74-1 at 2 ¶ 6.
[6]  R. Doc. 74-1 at 2 ¶ 5.
[7]  R. Doc. 70-3 at 3-4 ¶¶ 14-18; R. Doc. 74-1 at 3-4 ¶¶ 15-18.
[8]  R. Doc. 70-3 at 2 ¶ 7; R. Doc. 74-1 at 2 ¶ 7.
[9]  R. Doc. 70-3 at 2-3 ¶¶ 9-11; R. Doc. 74-1 at 2-3 ¶¶ 9-11.
[10]  R. Doc. 70-3 at 2-3 ¶¶ 8-11; R. Doc. 74-1 at 2-3 ¶¶ 8-11.
[11]  R. Doc. 70-1 at 2; R. Doc. 74.
[12]  R. Doc. 70-3 at 4 ¶ 21; R. Doc. 74-1 at 5 ¶ 21.

began welding the Chrome Weld with the wrong filler material.[13] The parties disagree whether the welding foreman, Jackie Wilson, or one of the pipe foremen, Lewis "Peyton" Travis, shared responsibility for the use of the incorrect filler material.[14] The erroneous filler material had to be cut out by a third-party contractor.[15] In response to this error, the night shift superintendent, Keith Kingsland, testified that he instructed Wilson to tell the welders that they had to do a better job on the Chrome Weld going forward.[16]

Plaintiff was then assigned to complete the Chrome Weld, and he worked on this weld for three nights.[17] The welding specifications for the Chrome Weld require that the pipe be pre-heated to a certain temperature during the welding process to prevent the weld from cracking.[18] A third-party contractor, Phoenix Services, provided heat treatment services on the project.[19] Defendant's welding procedure specification stated that the

---

[13]     R. Doc. 70-3 at 4 ¶ 22; R. Doc. 74-1 at 5 ¶ 22.

[14]     Defendant states that Wilson issued Hinton the wrong filler material. R. Doc. 70-3 at 4 ¶ 22. Plaintiff asserts that Travis, not Wilson, made the mistake. R. Doc. 74-1 at 5 ¶ 22. Travis testified that he wrote out the rod for the wrong filler wire. *See* R. Doc. 70-5 at 18 (Travis Depo. at 18).

[15]     R. Doc. 70-3 at 5 ¶ 24; R. Doc. 74-1 at 5 ¶ 24.

[16]     R. Doc. 70-6 at 10-11 (Kingsland Depo. at 49-50); *see also* R. Doc. 70-3 at 5 ¶ 26; R. Doc. 74-1 at 5 ¶ 26.

[17]     R. Doc. 70-3 at 5 ¶ 26; R. Doc. 74-1 at 5 ¶ 26; R. Doc. 74-2 at 10.

[18]     R. Doc. 70-3 at 5-6 ¶¶ 29-31; R. Doc. 74-1 at 6 ¶¶ 29-31.

[19]     R. Doc. 70-3 at 6 ¶ 30; R. Doc. 74-1 at 6 ¶ 30.

temperature must be checked with "temperature indicating crayons or an approved equal."[20] Plaintiff did not check the temperature on the Chrome Weld before he began welding, and represents that he has always relied on the third party contractor to provide heat for this type of weld.[21]

After plaintiff completed work on the Chrome Weld, the quality control staff reported that pre-heat treatment was not properly maintained during the welding process.[22] Plaintiff admits that this report was made, but argues that pre-heat treatment was in fact applied.[23] Plaintiff testified that the pipe was hot during the welding process.[24] But the parties agree that, whatever the underlying cause of the problem, the Chrome Weld was cut out for a second time and re-worked.[25]

## B. Underground Weld

Plaintiff was later assigned to weld a carbon steel pipe, referred to by the parties as the Underground Weld.[26] Plaintiff asserts that an unknown

---

[20] R. Doc. 74-6 at 10.
[21] R. Doc. 70-3 at 6 ¶ 35; R. Doc. 74-1 at 6 ¶ 35; R. Doc. 70-4 at 51-52 (Pl.'s Depo. at 89-90).
[22] R. Doc. 70-3 at 7 ¶ 39; R. Doc. 74-1 at 8 ¶ 39; R. Doc. 70-5 at 9 (Travis Depo. at 25).
[23] R. Doc. 74-1 at 7-8 ¶ 39.
[24] R. Doc. 70-4 at 53 (Pl.'s Depo. at 94); R. Doc. 74 at 13-15.
[25] R. Doc. 70-3 at 7-8 ¶¶ 42-43; R. Doc. 74-1 at 8 ¶ 42.
[26] R. Doc. 70-3 at 8 ¶¶ 44-45; R. Doc. 74-1 at 8 ¶¶ 44-45.

welder worked on the Underground Weld before plaintiff began work on it.[27]

Plaintiff did not check the prior welder's work before beginning to weld.[28]

Plaintiff represents that he was told to hurry up on this job and that the weld would not be tested by x-ray.[29] After plaintiff completed the weld, the Underground Weld was subjected to x-ray testing and failed the test.[30]

### C. Plaintiff's Discharge

On or about May 12, 2015, Kingsland was informed by quality control employees that the Chrome Weld needed to be cut out a second time.[31] Kingsland testified that he was told the pipe was not preheated.[32] According to Kingsland, he planned to suspend plaintiff and his welding foreman and to reprimand the pipe foreman in response to this mistake.[33] A few days later, Kingsland was informed by the night shift general foreman, Bobby Bloodsworth, that the Underground Weld failed an x-ray and that plaintiff

---

[27]     R. Doc. 70-3 at 8 ¶¶ 46-47; R. Doc. 74-1 at 8-9 ¶¶ 46-47.

[28]     R. Doc. 70-3 at 8 ¶ 47; R. Doc. 74-1 at 9 ¶ 47.

[29]     R. Doc. 74-1 at 9 ¶ 47. Defendant admits that one supervisor, Bobby Bloodsworth, told plaintiff that the Underground Weld was not supposed to be x-rayed. *See* R. Doc. 74-2 at 5.

[30]     R. Doc. 70-3 at 9-10 ¶¶ 49-53; R. Doc. 74-1 at 9 ¶¶ 49-53; R. Doc. 75-2 at 1; R. Doc. 77 at 5 (Knight Depo. at 40).

[31]     R. Doc. 70-3 at 10-11 ¶ 59; R. Doc. 74-1 at 9 ¶ 59.

[32]     R. Doc. 70-6 at 9 (Kingsland Depo. at 37).

[33]     *Id.* at 27, 36 (Kingsland Depo. at 71, 83).

was the welder on both the Chrome Weld and the Underground Weld.[34] Kingsland then instructed Bloodsworth to terminate plaintiff's employment.[35] Plaintiff was the only welder on the night shift to be terminated for substandard job performance between January 1, 2015, and June 1, 2015, after successfully completing qualifier welds.[36]

After his termination, plaintiff filed a charge of age and race discrimination with the Equal Employment Opportunity Commission.[37] Plaintiff received a right-to-sue letter on October 29, 2015.[38] On December 3, 2015, plaintiff filed a complaint in this Court alleging that defendant discharged him on the basis of race in violation of Title VII of the Civil Rights Act of 1964, as amended.[39] Defendant now moves for summary judgment.[40]

---

[34] *Id.* at 37-38 (Kingsland Depo. at 84-85); R. Doc. 70-3 at 11 ¶ 61; R. Doc. 74-1 at 10 ¶ 61;
[35] R. Doc. 70-3 at 11 ¶ 62; R. Doc. 74-1 at 10 ¶ 62.
[36] R. Doc. 74-2 at 6.
[37] R. Doc. 1 at 1 ¶ 3.
[38] *Id.*
[39] *Id.* at 1-4.
[40] R. Doc. 70.

## II.    LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went

uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (internal citation omitted). The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 *mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (quoting *Celotex*, 477 U.S. at 322)).

## III. DISCUSSION

### A. Requests to Strike

Both parties ask the Court to strike certain evidence. Plaintiff first requests the Court strike evidence of his bad welds at other jobs because he argues that his employment history is irrelevant and is inadmissible under Federal Rule of Evidence 404(b)(1).[41] Rule 404 provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Defendant states that it offers plaintiff's past employment records not to show that he performed bad welds, but to demonstrate that plaintiff was not qualified for his position.[42] Because the Court does not reach the issue of plaintiff's qualifications, it need not consider plaintiff's history with other employers.

Plaintiff also requests the Court strike the transcript of a recorded call between plaintiff and a former coworker, Tirrell Williams.[43] Plaintiff admits

---

[41] R. Doc. 74 at 17.

[42] R. Doc. 80 at 4. Defendant cites to Federal Rule of Evidence 405(b), which provides that "[w]hen a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct."

[43] R. Doc. 74-1 at 11 ¶ 74. Plaintiff's objection is directed at the portion of the transcript reproduced in defendant's undisputed fact no. 74. *See* R. Doc. 70-3 at 15 ¶ 74. It is not clear whether plaintiff also objects to the full transcript offered as defendant's exhibit G-1. *See* R. Doc. 70-15.

that he produced this recording, but argues that the transcript is uncertified, incomplete, and inaccurate.[44]  Defendant offers a signed declaration from defense counsel that the transcript is a true and correct transcription of the recording of the conversation between plaintiff and Williams.[45]  Moreover, "[a]t the summary judgment stage, materials cited to support or dispute a fact need only be *capable* of being 'presented in a form that would be admissible in evidence.'"  *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (quoting Fed. R. Civ. P. 56(c)(2)).  The transcript therefore need not be certified.  The Court has listened to the recording and finds the transcript to be accurate.  The request to strike is therefore denied.  But the Court further finds that the transcript is not material because nothing in either the transcript or in plaintiff's version[46] of his call with Williams either creates or precludes a genuine issue of fact.

Defendant requests the Court strike plaintiff's declaration[47] as inadmissible hearsay and as a sham affidavit that contradicts plaintiff's sworn deposition testimony.[48]  The Fifth Circuit has explained that "a plaintiff may not manufacture a genuine issue of material fact by submitting

---

[44]     R. Doc. 70-3 at 15 ¶ 73; R. Doc. 74-1 at 10-11 ¶¶ 73-74.
[45]     R. Doc. 70-14.
[46]     R. Doc. 74-1 at 12.
[47]     *Id.* at 2-16.
[48]     R. Doc. 80 at 1-2.

an affidavit that impeaches prior testimony without explanation." *Doe ex rel. Doe v. Dallas Indep. School Dist.*, 220 F.3d 380, 386 (5th Cir. 2000); *see also Keller v. Coastal Bend Coll.*, 629 F. App'x 596, 601 n.4 (5th Cir. 2015) (finding that a "sham affidavit" contradicting deposition testimony is not admissible on summary judgment). Plaintiff's declaration is combined with plaintiff's responses to defendant's statement of undisputed material facts.[49] The Court finds that some portions of plaintiff's declaration are admissible, and declines to strike the full declaration. As outlined more specifically below, the Court does not consider assertions in the declaration that contradict plaintiff's deposition testimony or contain inadmissible hearsay.

## B. Requirements for a Prima Facie Case

Title VII prohibits employers from "discharg[ing] any individual, or "otherwise [] discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff brings a claim of intentional discrimination on the basis of race.[50] Because plaintiff presents no direct evidence of racial discrimination, the Court considers his claim under the *McDonnell Douglas*

---

[49]     R. Doc. 74-1 at 2.
[50]     R. Doc. 1 at 4 ¶ 43.

burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 425 (5th Cir. 2000).

Plaintiff bears the initial burden to show a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. To establish a prima facie case, "an employee must demonstrate that [he] '(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group.'" *Morris v. Town of Independence*, 827 F.3d 396, 400 (5th Cir. 2016) (quoting *Willis v. Cleco Corp.*, 749 F.3d 314, 319-20 (5th Cir. 2014)).

Plaintiff offers no evidence to indicate that he was replaced by someone of a different race. Further, plaintiff acknowledges that he "does not have direct evidence or classical *prima facie* fourth prong comparative evidence."[51] But plaintiff contends that he can establish a prima facie case through evidence that the employer failed to follow its own procedures, offered inconsistent or changing explanations for his firing, and engaged in

---

[51]    R. Doc. 74 at 1.

racial discrimination within his five-man work crew.[52]  An employer's inconsistent explanations or failure to follow its own procedures are relevant to the issue of pretext, not to the requirements of a prima facie case.  *See Nasti v. CIBA Specialty Chem. Corp.*, 492 F.3d 589, 593-94 (5th Cir. 2007); *State v. New Palace Casino, LLC*, 187 F. App'x 350, 358-59 (5th Cir. 2006); *Tyler v. Union Oil Co. of Ca.*, 304 F.3d 379, 395-96 (5th Cir. 2002).

The Fifth Circuit has made clear that evidence of pretext is not a substitute for the requirement that a plaintiff first establish a prima facie case by showing differential treatment of similarly situated employees.  *See Paske v. Fitzgerald,* 785 F.3d 977, 985, 985 n.8 (5th Cir. 2015) (rejecting argument that plaintiff can satisfy fourth element of prima facie case by showing that stated reasons for firing were pretextual); *see also Williams v. Franciscan Missionaries of Our Lady Health Sys., Inc.*, 689 F. App'x 374, 375 (5th Cir. 2017) ("[Plaintiff] is correct that a similarly situated employee who was not terminated is not the only way to establish a *prima facie* case of discrimination.  He may also show that he was replaced by someone outside of the protected class.").  Plaintiff's argument that he can establish a prima facie case through "other circumstances" suggesting pretext therefore fails.

---

[52]     *Id.*

The Court has had great difficulty understanding plaintiff's disorganized and rambling brief, and identifying what facts and arguments plaintiff relies on to oppose summary judgment. As the Fifth Circuit has explained, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (internal citation and quotation marks omitted). The Court has nevertheless attempted to identify valid arguments and factual disputes within plaintiff's submissions. Despite plaintiff's statement that he "does not have evidence of favorable treatment of a comparable employee,"[53] his arguments regarding racial discrimination within his work crew could be construed as an attempt to satisfy the fourth element of a prima facie case through evidence that he was treated less favorably than similarly situated employees.

To meet the "'similarly situated employees' requirement, 'a plaintiff must show that he was treated less favorably than others 'under nearly identical circumstances.'" *Morris*, 827 F.3d at 401. An employment action is "taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor

---

[53] R. Doc. 74 at 1.

or had their employment status determined by the same person, and have essentially comparable violation histories." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (internal citations omitted). "If the difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer, the employees are not similarly situated for the purposes of an employment discrimination analysis." *Id.* at 260 (internal citation and quotation marks omitted).

### C. Proposed Comparators

The undisputed facts indicate that Kingsland made the decision to terminate plaintiff's employment after Kingsland was notified about problems with the Chrome Weld and the Underground Weld within a few days of each other, and heard that plaintiff was the welder on both these jobs.[54] Plaintiff argues that he was treated less favorably than two white employees, Travis and Hinton,[55] but neither of these individuals is similarly situated to plaintiff.

---

[54] R. Doc. 70-3 at 10-11 ¶¶ 59-62; R. Doc. 74-1 at 9-10 ¶¶ 59-62; R. Doc. 70-6 at 38 (Kingsland Depo. at 85).
[55] R. Doc. 74 at 6.

Travis was a pipe foreman involved in both Chrome Weld errors.[56] He received a written reprimand because of the problems with the Chrome Weld.[57] Travis is not similarly situated to plaintiff because he is not a welder,[58] and as a foreman, his job and responsibilities differed from those of plaintiff. *See Crosby v. Computer Science Corp.*, 470 F. App'x 307, 309 (5th Cir. 2012) (noting that plaintiff's supervisor was not an appropriate comparator); *Merritt v. United Parcel Service, Inc.*, 321 F. App'x 410, 414 (5th Cir. 2009); *Lee*, 574 F.3d at 259-60. Moreover, Kingsland testified that he did not consider discharging Travis because Travis was less responsible for the problems with the Chrome Weld than other employees.[59] It is also undisputed that Travis was not involved with the failure of the Underground Weld.[60]

Hinton is a welder and his job responsibilities were therefore more similar to those of plaintiff. But plaintiff cannot show that Hinton had a comparable violation history. It is undisputed that Hinton used erroneous filler material on the Chrome Weld, and that his work had to be cut out.[61]

---

[56]     R. Doc. 70-5 at 18 (Travis Depo. at 18).
[57]     R. Doc. 70-3 at 11 ¶ 60; R. Doc. 74-1 at 10 ¶ 60; R. Doc. 70-5 at 18 (Travis Depo. at 61); R. Doc. 70-6 at 27 (Kingsland Depo. at 71).
[58]     R. Doc. 74-4 at 34 (Travis Depo. at 81).
[59]     R. Doc. 70-6 at 28, 36 (Kingsland Depo. at 72, 83).
[60]     R. Doc. 70-3 at 10 ¶ 58; R. Doc. 74-1 at 9 ¶ 58.
[61]     R. Doc. 70-3 at 4-5 ¶¶ 22-24; R. Doc. 74-1 at 5 ¶¶ 22-24.

Kingsland acknowledged that a welder could be subject to discipline for using incorrect filler material and testified that he did not know why Hinton was not disciplined.[62]  But Kingsland also testified that he was unaware that Hinton was involved in the first failed attempt at the Chrome Weld.[63]  Further, plaintiff admits that the cut out caused by Hinton's use of incorrect filler material required less work and expense than the second cut out after plaintiff's work on the Chrome Weld.[64]  Hinton's involvement in the failures of the Chrome Weld is therefore not fully comparable to plaintiff's record.  *See Bryant v. Compass Group USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (finding that two employees accused of theft were not similarly situated when plaintiff's misconduct was potentially much more costly to the employer); *Lee*, 574 F.3d at 261 (explaining that a comparable violation history "may turn on the comparable seriousness of the offenses for which discipline was meted out").

Additionally, plaintiff fails to show that Hinton was involved in more than one bad weld.  Plaintiff asserts that Hinton failed one of his two

---

[62]     R. Doc. 74-2 at 12-13 (Kingsland Depo. at 41-42).
[63]     *Id.* at 33-34 (Kingsland Depo. at 80-81).  Plaintiff argues that there is a justifiable inference that Kingsland knew Hinton was the welder on the first failed Chrome Weld because he was the superintendent.  *See* R. Doc. 74 at 21.  But this assertion is not supported by specific evidence.
[64]     R. Doc. 70-3 at 7-8 ¶ 42; R. Doc. 74-1 at 8 ¶ 42.

production welds and made mistakes on three other welds.[65]  But this assertion is not supported by sufficient competent evidence to create a genuine issue of fact.  Plaintiff relies on the deposition testimony of Tirrell Williams, a fellow welder who testified that he believed Hinton failed a qualifying weld because he saw Hinton cutting out a weld.[66]  Williams further stated that he later saw Hinton cutting out other bad welds, and that Bloodsworth also observed Hinton cutting out a weld.[67]  In response to this testimony, defendant offers the sworn declaration of Alton Lennon Williamson, who served as a pipe foreman on Hinton's project.[68]  Williamson avers that both Hinton's qualifying welds passed inspection and that Hinton was directed to grind out the failed qualifying welds of other applicants.[69]  Williams's testimony that he saw Hinton cutting out welds is consistent with Williamson's declaration.  Williams was not a supervisor on the project or a member of the quality control staff.[70]  Williams's assumption that Hinton was cutting out his own welds, rather than the failed welds of others, is speculative and does not create a genuine issue of fact.

---

[65]     R. Doc. 74 at 6.
[66]     R. Doc. 74-5 at 11-12 (Williams Depo. at 43-44).
[67]     *Id.* at 3-4, 12 (Williams Depo. at 11-12, 44).
[68]     R. Doc. 70-12.
[69]     *Id.* at 2.
[70]     R. Doc. 80-1 at 3 (Williams Depo. at 26).

Williams acknowledged that he did not personally observe Hinton's qualifying welds, but testified that he "heard them guys say he [Hinton] had a spot" and "heard Payton [Travis] say it was one of his qualifiers."[71] Defendant objects to Williams's testimony as hearsay and speculation.[72] Plaintiff has not identified a legal basis to admit Travis's statement to Williams regarding Hinton's qualifying welds, and the Court finds this statement inadmissible. The unrebutted evidence in the record indicates that Williamson, not Travis, was the pipe foreman supervising Hinton's qualifying welds.[73] Plaintiff has not pointed to evidence indicating that Travis had personal knowledge of Hinton's qualifying welds. Nor has plaintiff shown that Travis's statement was made within the scope of his employment, rather than "in his capacity as wiseacre only." *Staheli v. Univ. of Miss.*, 854 F.2d 121, 126-27 (5th Cir. 1988); *see also Fairchild v. All American Check Cashing, Inc.*, 815 F.3d 959, 966-67 (5th Cir. 2016)

---

[71]    R. Doc. 74-5 at 11-12 (Williams Depo. at 43-44). Williams further testified that "I guess to keep his [Hinton's] job they put him fitting." *Id.* at 13. This assertion is speculative and irrelevant. Even if Hinton did change jobs, the Court has no further information about the circumstances surrounding this change of position or whether it constituted a demotion. A change in job description is not evidence that Hinton failed his qualifying welds or that he was treated differently than plaintiff under similar circumstances.

[72]    R. Doc. 80 at 1, 8.

[73]    R. Doc. 70-12.

(explaining that a managerial employee's statements were properly excluded as hearsay when the employee was not involved in the decision at issue).

Accordingly, the Court finds that plaintiff's assertions that Hinton failed his qualifying welds and made errors on other welds are speculative and unsupported by competent summary judgment evidence. *See Douglass v. United Serv. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (explaining that "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden" on summary judgment). The undisputed facts indicate that Hinton was involved in the first attempt at the Chrome Weld, but that repairing this initial mistake was less costly than the subsequent cut out after plaintiff's work on the Chrome Weld. No competent evidence demonstrates that Hinton was implicated in additional failed welds. *See Player v. Kansas City S. Ry. Co.*, 496 F. App'x 479, 482 (5th Cir. 2012) (finding that plaintiff's disciplinary record was not comparable to that of employees with fewer violations); *Bouie v. Equistar Chem. LP*, 188 F. App'x 233, 237 (5th Cir. 2006) (finding that white employee who failed to comply with one safety protocol was not similarly situated to plaintiff who failed to comply with two safety protocols).

Even if Hinton made mistakes on other welds, the Court has no information to suggest that those errors were as costly as the problematic

welds that plaintiff was involved in. Nor is there evidence that Hinton's purported mistakes occurred within a comparably short time period as the failures of the Chrome Weld and the Underground Weld within a few days of each other. The Court therefore finds that Hinton's employment history is not sufficiently similar to plaintiff's record to satisfy the fourth element of a prima facie case.

Plaintiff also asserts that a second unnamed white welder failed a production weld.[74] Plaintiff testified that he was told by other people on the job that white welders made bad welds and were allowed to fix them.[75] But plaintiff admits in his deposition that he has no direct knowledge of white welders with bad welds.[76] Williams similarly testified that there was another white welder who had a bad production weld.[77] But, like Williams's allegations against Hinton, this assertion is based solely on what Williams heard from others and on his observation that this unnamed welder was fixing a weld.[78] As explained above, Williams's hearsay testimony and speculation are not competent summary judgment evidence. Moreover, Williams acknowledged that he did not know of any additional bad welds by

---

[74]    R. Doc. 74 at 6.
[75]    R. Doc. 70-4 at 80 (Pl.'s Depo. at 129).
[76]    *Id.* at 81 (Pl.'s Depo. at 130).
[77]    R. Doc. 74-5 at 5-6 (Williams Depo. at 16-17).
[78]    *Id.* at 5 (Williams Depo. at 16).

this unnamed white welder.[79]  Defendant has offered evidence that both white and non-white welders were terminated from the project for substandard job performance between January and June of 2015.[80]

Accordingly, the Court finds that plaintiff has not offered competent evidence that he was treated less favorably than similarly situated employees outside his protected class.

### D. Plaintiff's Other Evidence

Plaintiff attempts to create issues of fact by arguing that he was not actually responsible for the problems with the Chrome Weld and Underground Weld.[81]  Plaintiff asserts that the Chrome Weld failed because of a lack of paperwork rather than a lack of preheating, and that the Underground Weld may not have required reworking.[82]  But plaintiff admits that both these welds had problems.  Plaintiff acknowledged that the Underground Weld failed x-ray examination.[83]  Plaintiff also admitted that

---

[79]    *Id.* at 6 (Williams Depo. at 17).
[80]    R. Doc. 70-7.
[81]    R. Doc. 74.
[82]    *Id.*
[83]    R. Doc. 70-4 at 70-71 (Pl.'s Depo. at 116-17).  Plaintiff's memorandum in opposition to summary judgment conclusorily states that plaintiff disputes that the Underground Weld failed an x-ray for lack of fusion.  *See* R. Doc. 74 at 17.  But this statement is inconsistent with both plaintiff's deposition testimony and plaintiff's declaration, which each acknowledge that the Underground Weld failed x-ray examination.  *See* R. Doc. 70-3 at 10 ¶ 53; R. Doc. 74-1 at 8-9 ¶¶ 44, 53.  Further, Michael Knight, the quality

he did not check the prior welder's work before beginning work on the Underground Weld.[84]

Further, it is undisputed that the Chrome Weld had to be cut out after plaintiff worked on it.[85] Plaintiff asserts that the pipe was properly heated and that the lack of pre-heat "was a problem invented to implicate plaintiff" and to shift responsibility onto him for the failed weld out of "supervisor self preservation."[86] Even if the Court accepted plaintiff's theory that his supervisors blamed him for the weld's failure to protect themselves, this is not evidence that similarly situated employees of a different race received more favorable treatment. *See Bryant*, 413 F.3d at 477 (noting lack of evidence that alleged conspiracy by other employees was racially motivated).

Moreover, the Court finds no genuine dispute of fact that plaintiff failed to follow proper procedures by admittedly not checking the temperature of the pipe before starting work on the Chrome Weld.[87]

---

control manager, testified that the Underground Weld was x-rayed and that two of the three x-rays were bad. *See* R. Doc. 77 at 5 (Knight Depo. at 40). Defendant has produced a copy of this x-ray report showing two rejections for lack of fusion. *See* R. Doc. 75-2 at 1. Accordingly, the Court finds no genuine issue of fact that the Underground Weld failed an x-ray examination.

[84] R. Doc. 70-3 at 8 ¶ 47; R. Doc. 74-1 at 9 ¶ 47.
[85] R. Doc. 70-4 at 82 (Pl.'s Depo. at 133); R. Doc. 77 at 3 (Knight Depo. at 31).
[86] R. Doc. 74 at 19-20.
[87] R. Doc. 70-3 at 6 ¶ 35; R. Doc. 70-4 at 51-52; R. Doc. 74-1 at 6 ¶ 35.

Defendant's welding procedure specification requires that temperature be checked with a "temperature indicating crayons or an approved equal."[88] Wilson testified that he called a meeting with the welders, including plaintiff, and reminded them to use temperature sticks.[89] Plaintiff acknowledges that he was at this meeting.[90] Williams also testified that temperature sticks were available and that he used them on chrome welds.[91] Travis similarly testified that a temperature stick is used to determine the proper temperature on chrome welds, and that plaintiff made a mistake by not using one.[92]

When considering whether plaintiff and potential comparators have similar violation histories, "the relevant perspective is that of the employer

---

[88]   R. Doc. 74-6 at 10.  Plaintiff argues that defendant's procedures also allow the use of thermocouples.  *See* 74-1 at 6 ¶ 34.  But plaintiff points to defendant's "Field Fabrication and Erection of Pressure Vessels and Piping" guidelines to support this argument rather than the the welding procedure specifications.  *See* R. Doc. 74-6 at 11-12.  The "Field Fabrication" document states that welding parameters are specified in the welding procedure specifications.  *Id.*  Knight, the quality control manager, also testified that the welding procedure specifications require the welder to check the temperature.  *See* R. Doc. 74-3 at 5-6 (Knight Depo. at 32-33).  Plaintiff also argues that his foremen, Travis and Wilson, "waived" the temperature stick requirement because they saw him work without it. *See* R. Doc. 74 at 7.  But there is no indication in the record that either Travis or Wilson had the authority to waive this requirement.

[89]   R. Doc. 74-5 at 21 (Wilson Depo. at 35).

[90]   R. Doc. 74-1 at 4, 6 ¶¶ 19, 28.

[91]   R. Doc. 80-1 at 4, 6 (Williams Depo. at 28, 63).

[92]   R. Doc. 70-5 at 10 (Travis Depo. at 34); R. Doc. 74-4 at 4 (Travis Depo. at 18).

at the time of the adverse employment decision." *Lee*, 574 F.3d at 260 n.27 (quoting *Perez v. Tx. Dept. of Crim. Justice*, 395 F.3d 206, 210 (5th Cir. 2004)); *see also Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001) (finding that proposed comparators were not similarly situated in part because supervisors were not aware of their alleged violations). Kingsland testified that he was informed by quality control staff that the Chrome Weld had not been preheated.[93] Kingsland further testified that he was told by Bloodsworth that the Underground Weld was bad.[94] Kingsland's unrebutted testimony is that he did not intend to terminate plaintiff for the Chrome Weld until he heard about the Underground Weld.[95]

Regardless whether plaintiff was ultimately most responsible for the problems with the Chrome Weld and the Underground Weld, it is undisputed that Kingsland believed that plaintiff was involved in both bad welds within a few days of each other when Kingsland made the decision to terminate his employment.[96] *See Morris*, 827 F.3d at 401-02 (finding that plaintiff was not similarly situated to proposed comparator in part because employer received verbal complaints about plaintiff's performance, even

---

[93]     R. Doc. 70-6 at 12-13 (Kingsland Depo. at 51-52).
[94]     *Id.* at 37 (Kingsland Depo. at 84).
[95]     *Id.* at 36-38 (Kingsland Depo. at 83-85).
[96]     *Id.*; R. Doc. 70-3 at 10-11 ¶¶ 59-62; R. Doc. 74-1 at 9-10 ¶¶ 59-62.

though these complaints were not documented). Plaintiff has not shown that another welder of a different race was similarly associated with two faulty welds within a short period of time.

To the extent that plaintiff argues that Bloodsworth, the night shift general foreman, influenced Kingsland's discharge decision, plaintiff has not presented competent evidence that Bloodsworth treated welders of a different race more favorably than him. Plaintiff relies on Williams's testimony that Hinton and other white welders failed their qualifying welds and that Williams assumed Bloodsworth was aware of these failures.[97] As explained above, Williams's speculation regarding what Bloodsworth knew is not competent summary judgment evidence. Additionally, plaintiff's argument that Bloodsworth "set him up" by telling him that the Underground Weld would not be x-rayed[98] is not evidence that Bloodsworth treated white employees more favorably. Accordingly, plaintiff has not demonstrated that similarly situated employees were treated more favorably than him "under nearly identical circumstances." *Morris*, 827 F.3d at 401.

Because plaintiff fails to satisfy the fourth element of a prima facie case, the Court need not determine whether plaintiff was qualified for his position.

---

[97] R. Doc. 74 at 6; R. Doc. 74-5 at 3-6 (Williams Depo. at 11-12, 16-17).
[98] R. Doc. 74 at 8.

Plaintiff has not established a prima facie case of racial discrimination and defendant is entitled summary judgment.

## IV.  CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED.  Plaintiff's complaint is DISMISSED.

New Orleans, Louisiana, this __6th__ day of November, 2017.

_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE